# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

MARGARITA A. COBOS,

    Plaintiff,

vs.                                                  Civil No. 98-575 BB/WWD

KENNETH S. APFEL,

    Defendant.

## MAGISTRATE JUDGE'S PROPOSED FINDINGS AND RECOMMENDED DISPOSITION
**Proposed Findings**

    1. This matter comes before the Court upon Plaintiff's Motion to Reverse or Remand Administrative Agency Decision, filed January 22, 1999 **[docket 5-1]**. The Commissioner denied Plaintiff's request for Social Security Disability Insurance (SSDI) and Supplemental Security Income (SSI) benefits both initially and on reconsideration. Plaintiff, age 46, alleges a disability due to right knee pain which commenced June 15, 1996. She has previously worked as a motel maid and has completed the tenth grade.

    2. After conducting an administrative hearing, the Commissioner's Administrative Law Judge ("ALJ") denied the applications, concluding that although Plaintiff could not return to past relevant work as a motel maid, she retained the residual functional capacity for sedentary and light work. The Appeals Council denied Ms. Cobos' request for review of the ALJ's decision, thus rendering the ALJ's decision the final decision of the Commissioner. Plaintiff now seeks review of that final decision pursuant to 42 U.S.C. §405(g).

3. The standard of review in social security appeals is whether the Commissioner's final decision, in this case the ALJ's decision, is supported by substantial evidence. Thompson v. Sullivan, 987 F.2d 1482, 1487 (10th Cir. 1993) (citations omitted). Additionally, the Commissioner's final decision can be reversed if the ALJ failed to apply the correct legal tests. Id. (citation omitted).

4. Plaintiff raises the following allegations of error with respect to the ALJ's decision: (1) that the ALJ erred by mechanically applying the grids at step five without the use of a vocational expert to determine the extent to which the claimant's impairments eroded the occupational base; and (2) that the ALJ's credibility determination on Plaintiff's exertional and nonexertional impairments and thus his finding of residual functional capacity to perform light or sedentary work is not supported by substantial evidence.

5. "To qualify for disability benefits, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity." Thompson at 1486 (citing 42 U.S.C. §§423 (d)(1)(A)); 1382c(a)(3)(A)). Social Security Regulations require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications. Id.; see 20 C.F.R. §§ 404.1520(a - f); 416.920. The sequential evaluation process ends if at any step the Commissioner finds that the claimant is disabled or not disabled. Id. (citations omitted).

6. At the first four levels of the evaluation, the claimant must show: (1) that she is not working; (2) that she has an impairment or combination of impairments severe enough to limit the ability to do basic work activities; (3) that the impairment meets or equals one of the listing of

2

impairments in 20 C.F.R. Pt. 404, Subpt.P, App.1; or (4) that she is unable to perform work done in the past.

7. At the fifth step, the Commissioner must produce evidence regarding the claimant's ability to perform other work. Reyes v. Bowen, 845 F.2d 242, 243 (10th Cir. 1988). The Medical-Vocational Guidelines ("grids") are used at this step to determine whether disability exists. 20 C.F.R. Part 404, Subpt. P, App. 2. The grids reflect the existence of jobs in the national economy at various residual functional capacity ("RFC") levels by incorporating administrative notice of occupational publications and studies. 20 C.F.R. §§404.1566(d); 416.966(d). This aids the Commissioner in determining what specific job types in the national economy the claimant can perform. The grids assume that the claimant's sole limitation is lack of strength, i.e., an exertional impairment. 20 C.F.R. Part 404, Subpt. P, App. 2, §2000(e)(2).

8. Plaintiff last worked June 15, 1996, and stopped when she hurt her knee at home playing tug-of-war with her husband. Initially she was advised to do range of motion exercises and take Motrin for discomfort. Tr. at 90, 95. She was later diagnosed with a right anterior cruciate ligament tear and right medial meniscus tear. Tr. at 97-98. Plaintiff feels she can't work because she cannot bend her knee, preventing her from being able to kneel and squat also.

9. She also has a problem with a right "crooked toe" and ankle, Tr. at 140, diagnosed as a congenital valgus deformity resulting in weakness on dorsiflexion (foot-drop) and which preexisted her knee injury. Plaintiff said that the deformity made her knee "pop" even before the knee was injured. Tr. at 140-41. The problem had caused Plaintiff pain off and on for years, but was told she could work "as long as she did not overdo it" or experience severe pain. Tr. at 88. In June 1995, she was given a shoe insert and flexible casting which helped some. Tr. at 87, 89.

Surgery to correct the deformity and prevent malpositioning of the foot was mentioned, Tr. at 87-88, but never done. Tr. at 141. Plaintiff did not seek further treatment for this since that time.

    10. Ms. Cobos claims that as a result of her knee problem, she becomes tired "real easy" and does no housework. She stated that her three children do all the housework, including cooking, mopping and sweeping. Tr. at 142. She told the ALJ at the hearing that she cannot walk more than a half-block before her knee gets tired and before it starts swelling and hurting. Tr. at 143-44. She said she can stand only 30 minutes at a time and that it hurts to sit because she cannot bend her knee to sit. She wore a knee brace to the hearing, and stated that she only wears it every other day for 30 minutes because its weight on her leg makes her tired. Tr. at 148.

    11. Plaintiff had surgery to repair the ligament and meniscus tears. Tr. at 110-11. Dr. Marshall Baca, who performed the surgery, felt that except for the usual postoperative tenderness on the site, the surgery had a "good result" although the knee was a little more loose than he would have liked. Tr. at 117. Dr. Baca emphasized to Plaintiff the importance of wearing the custom-fit immobilizer on a continual basis, but noted in follow-up that Plaintiff was not using the brace because she did not like it. He also noted her reluctance to start post-surgical rehabilitation. Tr. at 118. Although she did show up for rehabilitation, the therapist noted that Plaintiff told him she was not intending to do the exercises which were being developed for her use at home. Tr. at 114.

**First Alleged Error**

    12. Plaintiff first alleges that the ALJ erred by mechanically applying the grids at step five without the use of a vocational expert to determine the extent to which the claimant's impairments eroded the occupational base. The ALJ determined that application of the grids

(Rules 201.24 for sedentary work and 202.17 for light work) directed a conclusion that Plaintiff is not disabled. Tr. at 13.

13. The record contains an evaluation done by Dr. Dillon in August 1996. He opined that Plaintiff has a residual functional capacity to lift 10 pounds frequently and 20 pounds occasionally and stand or walk at least 2 hours in an 8-hour workday. The form does not appear to list any limitations with regard to sitting.[1] Tr. at 62. Another functional capacity evaluation was done several months later, in November 1996 by Dr. Eva Pacheco. Dr. Pacheco reported that Plaintiff had no difficulty speaking, thinking or handling, but that she would not be able to perform "any deep knee squatting or extended standing or walking, secondary to knee pain." Tr. at 101. Elsewhere in this evaluation, the doctor stated that Plaintiff was "unable to perform stooping, bending or squatting, secondary to knee pain." Id.

14. Dr. Pacheco opined that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently. Id. She also felt that although Plaintiff's ability to sit was not affected by her knee impairment, Plaintiff could stand and walk only 2 to 3 hours total out of an 8-hour day, with an ability to do so without interruption for only 15 to 30 minutes.

15. Both of these evaluations were done prior to Plaintiff's knee surgery. The ALJ noted that, "given the favorable result" of the surgery, the restrictions described in the evaluations no longer applied to the Plaintiff in such a way as to preclude work. Tr. at 12-13 (". . . I have concluded that the consultative examiner's restrictions represent the **minimum** capacities that the

---

[1] The box next to the phrase "less than about 6 hours in an 8-hour workday" was checked, with the word "void" written over it. Tr. at 62.

5

claimant has retained since her injury.") (emphasis supplied in original). In fact, Dr. Pacheco's assessment as to Plaintiff's ability to stand or walk was based on the ligamentous tears which made "extended walking difficult." Tr. at 104.

16. The ALJ's assumption that the surgery resolved any of the functional limitations mentioned in the two evaluations may ultimately be correct, but the record itself does not support this finding. Rather, the evidence in the record indicates that there is a question as to whether the Plaintiff can perform a full range of work in either of the two categories which the ALJ found she is capable of doing.

17. Application of the grids is appropriate only if the claimant is capable of performing a full range of work required at a particular exertional level on a daily basis and if the claimant possesses the physical capacity to perform most of the jobs falling within that category. Ragland v. Shalala, 992 F.2d 1056, 1058 (10th Cir.1993). Where a claimant's exertional capacity is further restricted by nonexertional limitations, however, reliance upon the grids is misplaced. Id.

18. In this case, based on the Plaintiff's postural limitations related to standing and walking, stooping and squatting, as well as unclear findings related to sitting, I find that the ALJ improperly relied on the grids in order to make a disability determination where there is still a question as to Plaintiff's functional limitations. Both of the grids used by the ALJ are specific to individuals who are unskilled. Unskilled types of jobs are particularly structured so that a person cannot sit or stand at will. SSR 83-12; see Jesurum v.Secretary of Dept. of Health & Hum. Serv., 48 F.3d 114, 120 (3rd Cir. 1995).

19. Plaintiff's restrictions as to standing and walking pose a question as to her ability to perform a full range of light work. Light work by definition is work that "requires a good deal of

walking or standing, or ... involves sitting most of the time with some pushing and pulling of arm or leg controls." Talbot v. Heckler, 814 F.2d 1456, 1463 (10th Cir. 1987) (claimant is not capable of light work where durational capacity for sitting, standing and walking is limited)(citing 20 C.F.R. § 404.1567(b)).

20. Also, an ability to stoop occasionally is required in most unskilled sedentary occupations. See SSR 96-9P. Depending on the degree of Plaintiff's limitations as described by Dr. Pacheco, Plaintiff's inability to stoop could have a significant effect on the range of jobs she can perform, from a significant erosion of jobs in the unskilled sedentary occupational base to only a minimal effect. Consultation with a vocational resource may be particularly useful for cases where the individual is limited to less than occasional stooping. Id.

21. A finding that an individual has the ability to do less than a full range of sedentary work does not necessarily equate with a decision of "disabled." SSR-96-9P. Nevertheless, based on the foregoing findings, Plaintiff's nonexertional limitations could be significant enough to reduce her work capacity to perform a full range of work; thus, a VE should have been consulted. Also, because the functional capacity evaluations predated Plaintiff's surgery, another one should be done which more accurately represents the Plaintiff's status post-surgery and which would indicate whether there has been any change or improvement.

**Second Alleged Error**

22. Plaintiff also alleges that the ALJ's credibility determination on Plaintiff's exertional and nonexertional impairments and thus his finding of residual functional capacity to perform light or sedentary work is not supported by substantial evidence. For the reasons given below, I find

that the ALJ supported his finding of noncredibility based on evidence from the record and the correct legal standard.

23. The ALJ took into account the relevant factors considered when evaluating credibility: the "levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence." Thompson v. Sullivan, 987 F.2d 1482, 1489 (10th Cir. 1993).

24. Contrary to Plaintiff's allegations of the ALJ's errors (characterized as the "usual slash and burn attack on the credibility of claimants appearing before him," Mem. Brf at 10), the ALJ did not disregard Plaintiff's symptoms. Although claimant's subjective complaints of pain must be considered in the evaluation process, these complaints by themselves are insufficient to establish disability. Talley v. Sullivan, 908 F.2d 585, 587 (10th Cir. 1990). Further, the ALJ's decision is based on the record "viewed as a whole." O'Dell v. Shalala, 44 F.3d 855, 858 (10th Cir. 1994).

25. The ALJ noted inconsistencies between Plaintiff's complaints of disabling pain and her testimony and other evidence. See Eggleston v. Bowen, 851 F.2d 1244, 1246-47 (10th Cir. 1988) (finding of noncredibility can be based on claimant's inconsistent answers to some questions and fact that assertions were at odds with much of the medical evidence in the case). At the time of the hearing, Plaintiff was using no medication for her pain. Tr. at 149.

26. At the hearing, Plaintiff represented that she could do none of the household chores. However, in the "physical daily activities questionnaire" dated July 1996, she listed "cleaning, washing clothes" and making beds as housekeeping duties she performed. Tr. at 56. In the same form, she stated that she prepares "either breakfast or lunch or dinner." Tr. at 57. Elsewhere in the questionnaire she states

> When I first wake up I take a shower and then prepare a cup of coffee and then I start preparing breakfast and then start cleaning house, and if laundry has to be done I'll do it. Tr. at 55.

27. While she also stated in the questionnaire that she needs help with these chores, Tr. at 56, the ALJ did not err in viewing them as inconsistent, contrary to Plaintiff's rather hyperbolic indictment of the administrative decision.[2]

28. In his decision, the ALJ mentioned Plaintiff's refusal to comply with her physician's advice concerning wearing the knee brace and doing physical therapy exercises at home. See, ¶ 9, above. The failure to follow prescribed treatment is a legitimate consideration in evaluating the validity of an alleged impairment. See Thompson v. Sullivan, 987 F.2d 1482, 1489 (10th Cir.1993). The record contains no evidence of a justifiable excuse for Plaintiff not to have followed through on either wearing the brace or doing exercises for her knee, other than the fact that she felt the brace was heavy.

---

[2] In the memorandum brief, Plaintiff's counsel accuses the ALJ of taking "bits and pieces out of context from the daily physical activities questionnaire" and using them "to improperly impeach and impugn the credibility of the Claimant as to her residual functional capacity." Mem. Brf. at 5. He then goes on to assert that the ALJ mischaracterized Plaintiff's testimony because of a "language and intellectual barrier" of the Plaintiff, and that the conclusion that she was not disabled was a "product of bias on the part of the Judge." The transcript does not show that an interpreter was requested, nor is bias alleged as a separate ground for error.

29. The ALJ's finding of noncredibility does not necessarily mean that Plaintiff's complaints of pain are entirely discounted. It does address Plaintiff's complaints of disabling pain. "Not all pain is disabling and the fact that plaintiff cannot work without some pain or discomfort is not sufficient cause to hold that plaintiff is entitled to social security disability benefits." Talley v. Sullivan, 908 F.2d 585, 587 (10th Cir. 1990).

30. When a claimant's testimony is found not to be entirely credible, an ALJ may rely on the grids when evaluating non-exertional impairment. Williams v. Bowen, 844 F.2d 748, 755 (10th Cir. 1988). In this case, my finding that the determination of noncredibility was supported by substantial evidence does not affect my findings regarding Plaintiff's first allegation of error. Even discounting Plaintiff's subjective complaints of disabling pain, the ALJ's use of the grids was improper based on the functional capacity evaluations which are part of the record, particularly in light of the fact that they were generated prior to surgery.

31. In sum, I find that (1) the ALJ erred by mechanically applying the grids at step five without the use of a vocational expert to determine the extent to which the claimant's impairments eroded the occupational base; and (2) the ALJ's credibility determination on Plaintiff's exertional and nonexertional impairments and thus his finding of residual functional capacity to perform light or sedentary work is not in error and is supported by substantial evidence.

### Recommendation

I recommend that Plaintiff's Motion to Reverse or Remand Administrative Agency Decision **[docket 5-1]** be granted in part in that this cause be remanded to the Commissioner for the following purpose: (1) to obtain a functional capacity assessment to evaluate Plaintiff's post-

surgical status regarding her knee impairment followed by a step five analysis to determine her residual functional capacity, and (2) to consult a vocational expert in order to determine whether any functional or postural limitations erode any part of the light or sedentary work categories and whether Plaintiff can do work in the national economy. Timely objections to the foregoing may be made pursuant to 28 U.S.C. § 636(b)(1)(C).

                                                 UNITED STATES MAGISTRATE JUDGE